IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| Karen R. Schneiderman, | CASE NO. 1:22-cv-01745 |
| Plaintiff, | DISTRICT JUDGE<br>Bridget Meehan Brennan |
| vs. | MAGISTRATE JUDGE<br>James E. Grimes Jr. |
| Commissioner of Social Security, | |
| Defendant. | **REPORT &<br>RECOMMENDATION** |

Plaintiff Karen R. Schneiderman filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

### Procedural background

In September 2020, Schneiderman filed an application for disability insurance benefits alleging a disability onset date of January 1, 2017,[1] and a

---

[1]  "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

last-insured date of December 31, 2021.[2] Tr. 60. She alleged that she was disabled due to neurocognitive issues and depression.[3] *Id*. The Commissioner denied Schneiderman's application at the initial level and upon reconsideration. Tr. 60–69, 70–78. Schneiderman requested a hearing before an Administrative Law Judge (ALJ). Tr. 95–96.

In October 2021, an ALJ held a hearing at which Schneiderman and a vocational expert testified. Tr. 34–59. The next month, the ALJ issued a written decision finding that Schneiderman was not disabled. Tr. 12–33. This decision became final in August 2022, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981. Schneiderman filed this action in September 2022. Doc. 1. She asserts the following assignments of error:

1. The ALJ committed harmful error when[,] at Step Three of the Sequential Evaluation[,] he failed to find that the combination of Schneiderman's symptoms met and/or equaled Listing 12.02.

2. The ALJ committed harmful error when he modified the definition of superficial interaction.

3. The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling

---

[2]     To be entitled to Disability Insurance Benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before his or her last-insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disab. Claims Prac. & Proc.* § 5:3 (2nd ed. 2022). The relevant time period in this case runs from Schneiderman's alleged disability onset date, January 1, 2017, through her date last insured, December 31, 2021. Tr. 60.

[3]     By December 2020, Schneiderman had added dementia, depression, sleep apnea, hypothyroidism, and gastroesophageal reflux disease (GERD) to the illnesses, injuries, and conditions in her disability claim. Tr. 61.

> (SSR) 16-3p and failed to find that the intensity, persistence and limiting effects of Schneiderman's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

Doc. 6, at 1.

## Factual background

### 1. Personal and vocational evidence

Schneiderman was born in July 1958 and was 58 years old on the alleged disability onset date. Tr. 27, 60. She lives with her wife Tracy Messer and their dog. Tr. 40–41. After graduating from high school, Schneiderman obtained a bachelor's degree from The Ohio State University and a law degree from the University of Toledo; she later attended Kent State University for a second undergraduate degree in library science. Tr. 40. Schneiderman was previously licensed to practice law in Ohio, but her license is now inactive. Tr. 40, 42. Until 2016, Schneiderman worked as a law librarian and legal research professor, most recently at the University of Hawaii. Tr. 41–42. She was previously employed at Drexel University and Brooklyn Law School. Tr. 42.

### 2. Medical impairment evidence from before the date last insured (December 31, 2017)[4]

Throughout the relevant time period, Schneiderman received the majority of her treatment at the Cleveland Clinic, from providers, including Steven Shook, M.D., who were affiliated with the Clinic's Center for Brain

---

[4] The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

Health and Neurological Institute. *See, e.g.,* Tr. 235, 288–89, 299–301, 563.  In August 2016, a few months before Schneiderman's alleged disability onset date, she had a consultative examination with Dr. Shook and informed him that she first noticed a decrease in the reliability of her memory around 2014. Tr. 334. Schneiderman scored 25/30 on the Montreal Cognitive Assessment (MoCa) test, indicating mild cognitive impairment.[5] *Id.* Otherwise, Schneiderman's mental status was clinically normal; Dr. Shook found that she had a normal memory, normal attention span, normal concentration, and a normal fund of knowledge. Tr. 336.

The next year, in August 2017, Schneiderman was evaluated by neurologist Elizabeth Spurgeon, M.D. Tr. 302. Schneiderman reported needing to use GPS when she drove and said that she had difficulty remembering names, conversations, and appointments. Tr. 302. She denied having trouble with organization and mentioned that she led a book club. Tr. 303.

---

[5]    The MoCa test is a series of tasks that assesses how well the brain functions in eight cognitive domains. *The MoCa Test for Dementia*, Healthgrades,  https://www.healthgrades.com/right-care/dementia/the-MoCa-montreal-cognitive-assessment-test-for-dementia (last visited June 16, 2023). A provider administers the MoCa test to help diagnose a brain condition, like mild cognitive impairment or dementia, and the severity of that condition. *Id.*

A MoCa test score between 26 and 30 points indicates normal cognitive abilities. *How Does MoCa Scoring Work?, The MoCa Test for Dementia*, Healthgrades,  https://www.healthgrades.com/right-care/dementia/the-MoCa-montreal-cognitive-assessment-test-for-dementia (last visited June 16, 2023). A score of 19 to 25 indicates mild cognitive impairment. *Id.* Scores between 11 and 21 suggest mild Alzheimer's disease, though there is some overlap between mild Alzheimer's disease dementia and mild cognitive impairment. *Id.*

Schneiderman's MoCa test score—22/30—indicated mild cognitive impairment. Tr. 304. Her mental status examination was otherwise clinically normal; Dr. Spurgeon found that Schneiderman had a normal memory, a normal attention span, normal concentration, and a normal fund of knowledge. Tr. 304.

In September 2017, Schneiderman was examined by neuropsychologists Aaron Bonner-Jackson, Ph.D., and Ashley Miller, Ph.D. Tr. 299–301. Dr. Bonner-Jackson wrote that Schneiderman could be "tangential" and "mildly disinhibited," though she had "no difficulty" following task instructions. Tr. 300. Schneiderman had low-average memory encoding[6] and her delayed recall ranged from average to extremely low. Tr. 301. Dr. Bonner-Jackson found that Schneiderman had impaired memory with a particularly weak working memory, Tr. 300–01, but that she otherwise performed between average and superior during the neuropsychological examination. *Id.* An MRI of Schneiderman's brain showed mild volume loss and "minimal" white matter disease. Tr. 288–89.

In October 2017, Schneiderman saw Dr. Spurgeon to discuss the results of her neuropsychological examination by Doctors Bonner-Jackson and Miller. Tr. 295–98. Dr. Spurgeon informed Schneiderman that her cognitive symptoms

---

[6]     Memory encoding is the initial learning of information. *Memory Encoding*, The Human Memory, https://human-memory.net/memory-encoding/ (last visited June 15, 2023). It is how the brain converts information coming from a sensory input into a form that will allow it to be stored in the brain. *Id.*

could be consistent with Alzheimer's disease, hippocampal sclerosis, or hippocampal atrophy resulting from an infectious process. Tr. 297. Dr. Spurgeon indicated that further testing could be helpful to clarify the diagnosis. *See* Tr. 298.

### 3. Medical impairment evidence from after Schneiderman's date last insured (December 31, 2017)

In August 2018,[7] Schneiderman had an appointment with physician's assistant Athena Loughrin, PA-C. Tr. 272–74. Schneiderman reported that she had recently attended a brain program at the Mayo Clinic, started exercising three times per week with a personal trainer, and was walking her dog more frequently. Tr. 273. Schneiderman's MoCa test score—24/30—indicated mild cognitive impairment. Tr. 274. Loughrin found that Schneiderman was alert and oriented with unremarkable speech and language, a pleasant affect, normal grooming, a calm emotional state, a logical thought process, and appropriate thought content. Tr. 274.

In February 2019, Schneiderman had a follow-up with Loughrin. Tr. 260–62. She denied any significant changes in her memory or thinking, but admitted that she had trouble remembering where she had parked her car and needed to reread pages in her novel, though this didn't frustrate her. Tr. 260.

---

[7]     The facts section of the Commissioner's brief lists the facts in this paragraph as appearing in Cleveland Clinic notes from December 2017, prior to Schneiderman's last insured date. *See* Doc. 7, at 3 (citing Tr. 274). They appear, however, in Loughrin's notes from August 2018, which was after the date Schneiderman was last insured. *See* Tr. 272–74.

Schneiderman was cognitively alert and cooperative, oriented, and normally groomed, with a good mood and a pleasant affect, a calm, pleasant emotional state, and a logical but amnestic thought process. Tr. 261–62. She reported being independent in all activities of daily life, exercising regularly, attending Alcoholics Anonymous (AA) meetings, and planning an upcoming trip to Pittsburgh for the 90th birthday of an aunt. Tr. 261. Loughrin found that Schneiderman had a mild cognitive impairment and that she was "stable from a functional standpoint." Tr. 262. Loughrin instructed Schneiderman to return in six months for a follow-up.

Two months later, Schneiderman and her wife went to see Loughrin earlier than anticipated because Schneiderman's memory issues had gotten worse. Tr. 255. Messer said that she had recently observed Schneiderman, who was normally meticulous and organized, behaving unusually. *Id.* For example, she forgot about raw chicken that she'd left out to thaw and ordered the same desk twice. *Id.* Schneiderman said that she didn't find either instance particularly frustrating. Tr. 255. She told Loughrin about her upcoming travel plans to visit Hawaii with Messer. *See* Tr. 255. Loughrin observed that Schneiderman did not repeat herself during the appointment. *Id.* She found Schneiderman cognitively alert and cooperative, oriented, and normally groomed, with unremarkable speech and language, a good mood, a pleasant affect, a calm, pleasant emotional state, and a logical but amnestic thought

process. Tr. 256. Loughrin increased Schneiderman's medication and instructed her to return in three to four months for a follow-up. *Id*.

Schneiderman next saw Loughrin in July 2019. Tr. 250–52. Schneiderman reported having been involved in a car accident and said that the cause of the collision was distraction; she'd been using her phone while driving. Tr. 250. Schneiderman was still able to independently perform all of her daily activities. Tr. 251. Loughrin found Schneiderman cognitively alert and cooperative, oriented, and normally groomed, with unremarkable speech and language, a pleasant affect, a calm emotional state, a logical but amnestic though process, and appropriate thought content. Tr. 253. Schneiderman was, however, unable to recall three out of five objects on a delayed recall task, Tr. 253, and a lower MoCa test score—16/30—indicated moderate cognitive impairment. Tr. 251. Although Loughrin described Schneiderman as functionally stable, she nonetheless increased Schneiderman's medication. Tr. 251, 253.

In August 2019, Schneiderman saw occupational therapist Aaron Nicka, to whom she reported that she was increasingly distractible, whichwas negatively affecting her self-care. Tr. 248. Nicka found that Schneiderman appeared slightly impulsive with impaired attention, and noted that she engaged in off-topic conversation during the session. Tr. 248–49. He also found, however, that Schneiderman was fit to drive, demonstrated a good

understanding of her care plan and treatment, and had a generally intact mental status. Tr. 248–49.

In January 2020, Schneiderman had a follow-up with Loughrin. Tr. 244–46. Schneiderman was able to independently perform all activities of daily life. Tr. 244. She was able to drive and enjoyed reading, working out, painting at a weekly art class, attending AA meetings and religious services, and planning travel abroad. Tr. 245. Loughrin found Schneiderman cognitively alert and cooperative, oriented, and normally groomed, with unremarkable speech and language, a fine mood, a calm emotional state, and a logical thought process. Tr. 245, 246. Loughrin said Schneiderman was "stable from a functional standpoint" and continued her medications without adjustment. Tr. 246.

In August 2020, Loughrin noted that Schneiderman had amnestic mild cognitive impairment with borderline Alzheimer's Disease biomarkers. Tr. 235, 238. Schneiderman reported doing well and remaining active in her activities, such as religious services and AA meetings. *Id.* Although Messer mentioned she had noticed a decline in Schneiderman's ability to problem solve and handle complex daily tasks, Schneiderman's MoCa test score—23/30, indicating mild cognitive impairment—had improved significantly since July 2019. Tr. 237–38. Schneiderman's neurological examination was normal, except that Loughrin found her thought process amnestic and repetitive. Tr. 238.

In May 2021, Schneiderman reported that she was still able to attend online AA meetings and religious services, visit family, walk her dog, and play games on her phone. Tr. 563–68. She mentioned, however, that she felt apathetic and indicated that she'd stopped driving because she wasn't comfortable doing so. Tr. 563. Messer said she'd observed Schneiderman struggle to recall what day of the week it was or the purpose for a given set of plans. *Id.* Messer reported that she felt Schneiderman was declining, though she acknowledged Schneiderman's abilities to perform all activities of daily life. Tr. 563. Schneiderman's MoCa test score—21/30—remained indicative of mild cognitive impairment. Tr. 566.

### 4.  *State agency and other medical opinion evidence*[8]

In December 2020, state agency psychologist Courtney Zeune, Psy.D., reviewed the medical record and found that Schneiderman was moderately limited in each of the "Paragraph B" areas.[9] Tr. 64. Specifically, Dr. Zeune

---

[8]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[9]     Paragraph B of each mental disorder listed in Section 12.00— except 12.05—provides criteria and a rating scale to assess the degree of limitation that a mental disorder has on a claimant's ability to  function. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(A)(2)(b) (internal citations omitted). The criteria represent four broad areas of mental functioning used in a work

found Schneiderman moderately limited in the ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; and respond appropriately to changes in the work setting. Tr. 66–67.

Dr. Zeune found that Schneiderman was not significantly limited in the ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) make simple work-related decisions; (8) ask simple questions or request assistance; (9) accept instructions and respond appropriately to criticism from supervisors; (10) get

---

setting: (1) the ability to understand, remember, or apply information; (2) the ability to interact with others; (3) the ability to concentrate, persist, or maintain pace; and (4) the ability to adapt or manage oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00 (A)(2)(b); (B). The Social Security Administration (SSA) considers the degree to which a medically determinable mental impairment affects these areas and the claimant's ability to function independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00 (A)(2)(b). To satisfy Paragraph B, a claimant's mental disorder must result in an "extreme" limitation of one, or a "marked" limitation of two, of the four broad areas of mental functioning. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(B).

along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (12) be aware of normal hazards and take appropriate precautions; (13) travel in unfamiliar places or use public transportation; and (14) set realistic goals or make plans indecently of others. Tr. 66–67.

Dr. Zeune found that Schneiderman could perform simple and routine work with tasks that remained reasonably static. *Id*. She could adapt to infrequent changes as long as any changes were explained and demonstrated. *Id*. She had the capacity to complete short-cycle work tasks that didn't require adherence to any strict time or production demands. *Id*. She was able to interact on a superficial level with coworkers and supervisors but did not have the patience for service with the general public. *Id*.

In April 2021, upon reconsideration, state agency psychologist Karla Delcour, Ph.D., reviewed the medical evidence and adopted Dr. Zeune's findings. Tr. 75–76.

### 5. *Testimonial evidence*

Schneiderman and a vocational expert testified during the hearing in June 2021. Tr. 34–59. Schneiderman was represented by attorney Debra Shifrin, who began the hearing with an opening statement indicating that, while she wasn't sure whether Schneiderman satisfied Listing 12.02, the evidence showed a decrease in Schneiderman's cognition beginning in August

12

2020. Tr. 39. She also claimed that Schneiderman has continued to deteriorate since that time. *Id*. Shifrin explained that due to the nature of Schneiderman's impairments, Messer would testify about Schneiderman's memory difficulties and cognitive decline. Tr. 39, 41.

During the hearing, Schneiderman explained that her inability to work was primarily due to cognitive decline and being unable to drive. Tr. 42–43. Schneiderman discussed the fact that, due to performance issues, the University of Hawaii had declined to renew her contract in 2016. Tr. 45. She attributed her performance issues to her declining memory and explained that there came a point at which she could no longer "[h]old[] information in [her] head long enough" to respond to professors seeking her assistance in conducting highly skilled research. *See* Tr. 45.

The ALJ asked whether Schneiderman thought that she would find it difficult to learn to do a new job, explaining that she must explore whether a clamant has the capacity to perform any work, not just the claimant's past relevant work. Tr. 47. Schneiderman responded that it would depend, but affirmed that her current ability and skills would allow her to work as "a clerk or something like that." Tr. 47, 49–50. Schneiderman denied having any physical limitations, Tr. 48, and said she didn't think she would struggle when receiving criticism from a supervisor, Tr. 47–48.

Messer testified that over the previous year, Schneiderman's short-term memory had worsened. Tr. 52–53. Messer provided examples, including that

Schneiderman did not remember having unloaded the dishwasher, forgot that she'd placed shucked ears of corn in a pot of water to cook, struggled to recall which day of the week it was, and couldn't remember how to use a computer tablet, which she'd recently learned. *Id.* Messer said that Schneiderman decided not to drive anymore after having "a couple accidents running stop signs[,] … hit[ting] a vehicle[,] and total[ing] [their] car." Tr. 53. Messer said that if Schneiderman were interrupted, she wouldn't be able to remember simple instructions, and, as a result, Messer believed that Schneiderman could not perform even a simple job. Tr. 53–54.

Vocational expert Millie Droste testified. Tr. 54–58. Droste classified Schneiderman's previous jobs—as a university librarian, a specialty librarian, and law school faculty member—as light, highly-skilled work. Tr. 55. Droste opined that if a hypothetical individual with the same age, education, and work experience as Schneiderman had the limitations assessed in Schneiderman's residual functional capacity (RFC),[10] described below, such an individual would be unable to perform any of her past work. Tr. 56. Within the RFC, however, Droste said that an individual like Schneiderman could perform unskilled, medium work such as hospital cleaner, industrial sweeper or cleaner, and automobile detailer. Tr. 56. Such an individual would be

---

[10]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

precluded from all work if he or she were off-task twenty percent of a workday or absent more than two days per month on an ongoing basis. Tr. 56–57.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since January 1, 2017, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: neurocognitive disorder and depressive disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand, remember, and carry out simple, short-cycle instructions in a routine work setting with few, minor changes; can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others, and the occupation does not require interaction with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born [in July 1958] and was 58 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2017, through the date of this decision (20 CFR 404.1520(g)).

Tr. 17–29.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

16

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the

duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which"

the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

*Issue 1: Whether the ALJ committed reversible error at step three when he determined that Schneiderman's mental impairment did not meet or equal Listing 12.02, which addresses neurocognitive disorders.*

Schneiderman says that the ALJ "erroneously concluded that [Schneiderman] only had moderate limitations in each of the '[Paragraph] B' criteria" under Listing 12.02, arguing that "[t]he actual evidence … demonstrated that these conclusions that she had only moderate limitations were in error and contrary to the evidence in the record." Doc. 6, at 8. She writes that, "[t]he crucial fact is that the evidence demonstrated, as described above, that Schneiderman was unable to independently and effectively sustain the crucial activities needed to engage in substantial gainful activity on a sustained and full-time basis without the need for at least daily reminders of how to perform a job." Doc. 6, at 9–10.

As a threshold matter, Schneiderman ignores the standard of review and never explains how the ALJ's decision is not supported by substantial evidence. She doesn't explain how the ALJ's findings were erroneous, she recites the same evidence as cited by the ALJ in his decision, and she provides no legal authority to show that the ALJ's decision was erroneous. So Schneiderman has forfeited the issue. *See McPherson v. Kelsey*, 125 F.3d 989,

19

995–96 (6th Cir. 1997); *Sharpe v. Comm'r of Soc. Sec.*, No. 1:20 CV 2732, 2022 WL 2127960, at *4 (N.D. Ohio June 14, 2022) (citing *Bard v. Brown Cty.*, 970 F.3d 738, 750 (6th Cir. 2020)).

Even if Schneiderman had made a proper argument, however, she would not prevail. To satisfy Listing 12.02, a claimant must meet subparts A and B or subparts A and C.[11] To meet Listing 12.02 under the Paragraphs A and B criteria, a claimant must present:

> A. Medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas:
>
> (1) complex attention;
> (2) executive function;
> (3) learning and memory;
> (4) language;
> (5) perceptual-motor; or
> (6) social cognition;
>
> and
>
> B. Extreme limitation of one, or a marked limitation of two, of the following areas of mental functioning:
>
> (1) the ability to understand, remember, or apply information;
> (2) the ability to interact with others;
> (3) the ability to concentrate, persist, or maintain pace; and
> (4) the ability to adapt or manage oneself.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(A), (B).

---

[11]    Schneiderman's listing argument is based on the Paragraph B criteria. She does not claim that the ALJ erred in finding that she did not meet or equal Listing 12.02 under subpart C, thus this recommendation does not address the requirements of subpart C.

At step three, the ALJ found that Schneiderman had no more than a moderate limitation in each of the Paragraph B areas of mental functioning and thus that she did not have marked or extreme limitations as required by Listing 12.02B. Tr. 19–20; *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00B. Schneiderman purports to challenge this finding, Doc. 6, at 9–10, for which the ALJ provided ample support. Tr. 19–20; *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A, 12.00B.

The ALJ determined that Schneiderman was moderately limited in the ability to understand, remember, or apply information. Tr. 19. This area of functioning refers to one's ability to learn, recall, and use information for work activities, such as learning terms, instructions, and procedures, or following one- or two-step instructions. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E(1). The ALJ found support for his determination in Schneiderman's Function Report, in which Schneiderman wrote that she could use a computer to shop but could not remember instructions or information, forgot to look for reminders she'd left herself, had difficulty recalling past experiences and long-ago learned job-related material, and struggled to remember new names. Tr. 19 (citing Tr. 192–95).

The ALJ further supported his finding with Schneiderman's testimony, in which she said she had trouble learning new tasks, particularly ones that involved multiple steps and found it hard to retain reading material. Tr. 19. She said that she used pillboxes for medication, which she had no trouble

remembering to take as prescribed. *Id*. The ALJ cited treatment notes listing Schneiderman's most prominent symptoms of mild cognitive impairment as difficulty with delayed recall and short-term memory. Tr. 19 (citing Tr. 254, 299–301). The ALJ also noted that at each of Schneiderman's appointments, she was able to explain her symptoms to her providers, understand their responsive medical explanations, demonstrate an understanding of her occupational therapy care plan and treatment, and follow the at-home program provided by her therapist. Tr. 19 (citing Tr. 235, 248–49, 251, 265–66, 273–74, 300–01, 563). Schneiderman reported the ability to perform all of her activities of daily living, including attending AA meetings and religious services online. *Id*. Schneiderman reported exercising regularly, leading a book club, attending a weekly art class, and planning overseas travel. Tr. 245, 303. Additional evidence in the record thus supports the ALJ's finding that Schneiderman had only a moderate limitation in understanding, remembering, and applying information.

The ALJ determined that Schneiderman was moderately limited in her ability to interact with others. Tr. 19. This area of functioning refers to one's ability to relate to and work with supervisors, co-workers, and the public. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E(2). The ALJ noted that, despite the global COVID-19 pandemic, Schneiderman interacted with her personal trainer, fellow religious service attendees, and members of AA, and kept in touch with friends and family through visits, phone calls, email, text, and video

22

chat. Tr. 19 (citing Tr. 235, 245, 273). The ALJ cited Schneiderman's Function Report, in which she denied having trouble getting along with others, though he acknowledged Schneiderman's indication that she struggled to maintain social activity like volunteering and keeping track of conversations. Tr. 19 (citing Tr. 193, 196). The ALJ noted that providers routinely described Schneiderman as pleasant and calm, and noted her ability to maintain good eye contact and express herself clearly. Tr. 19 (citing Tr. 235, 563–67). He also highlighted records that documented Schneiderman's repetitive verbalizations during an appointment and her decreased interest in socializing. *Id*. ALJ cited sufficient evidence in the record to support the finding that Schneiderman had a moderate limitation in the ability to interact with others.

The ALJ determined that Schneiderman was moderately limited in her ability to concentrate, persist, and maintain pace. Tr. 19–20. This area of functioning refers to one's ability to focus attention on work activities and stay on task at a sustained rate. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00E(3). The ALJ contrasted Schneiderman's MoCA test scores indicating clear restrictions with her mental status examinations showing that she could concentrate and that her thought processes tended to be logical, even though she was amnestic and tangential at times. Tr. 20 (citing Tr. 274, 300-01, 304, 336). The ALJ cited Schneiderman's Function Report, in which she wrote about tiring easily, having difficulty tracking conversations, and paying attention in the moment without being able to recall what happened later. Tr. 19–20 (citing

23

Tr. 192, 196–97). The ALJ referenced Schneiderman's fatigue and decreased ability to concentrate when tired, and noted that she'd gotten into a car accident while distracted. Tr. 20 (citing Tr. 237, 252, 256, 265–66, 274, 300–01, 328, 567). He also noted, however, that she was regularly cognitively alert and fully oriented, with thought processes that were generally logical but amnestic and—on one occasion—tangential. *Id*. The ALJ thus cited substantial evidence in the record to support his finding that Schneiderman had only a moderate limitation in concentration, persistence, and maintaining pace.

The ALJ determined that Schneiderman was moderately limited in the ability to adapt or manage herself. Tr. 20. This area of functioning refers to one's ability to regulate emotions, control behavior, and maintain well-being in a work setting. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00E(4). The ALJ cited Schneiderman's Function Report, in which she indicated that she was able to handle stress appropriately but became nervous and worried if she needed to adapt to changes in routine, Tr. 20 (citing Tr. 198), denied having any specific difficulty performing her activities of daily living, Tr. 20, and confirmed her ability to perform simple household chores and make simple meals for herself, Tr. 20 (citing Tr. 193–94). The ALJ cited findings in the medical records that Schneiderman experienced good quality sleep and independently performed the activities of daily life. Tr. 20 (citing Tr. 238, 253, 329, 563–67). He noted self-screenings for depression that ranged from minimal to mild, and findings that Schneiderman occasionally exhibited

24

dysphoria, was usually calm and pleasant, had an appropriate emotional reaction to learning of her mild cognitive impairment diagnosis, had recently rated her quality of life as "excellent[,]" and did not report or exhibit significant emotional dysregulation or disinhibition. *Id.* Based on the findings at each of the Paragraph B areas, the ALJ determined that Schneiderman had not satisfied Listing 12.02.  Tr. 20.

Schneiderman says nothing about why substantial evidence does *not* support the ALJ's decision. Instead, her challenges amount to inappropriate "invitations to reweigh the evidence." *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. Dec. 1, 2022). But "[t]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job." *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (citing *Dyson v. Comm'r of Soc. Sec.,* 786 F. App'x 586, 588 (6th Cir. 2019)). *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 588 (6th Cir. 2019) (citing *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)). Schneiderman may disagree with the ALJ's finding her was no more than moderately limited in each of the Paragraph B criteria, but disagreement does not entitle her to remand. *See Hutchins v. Berryhill*, No. 18-10182, 2019 WL 2353184, at *2 (E.D. Mich. June 4, 2019).

*Issue 2: Whether the ALJ committed harmful error when he explained his RFC finding that Schneiderman was limited to superficial interaction.*

The ALJ found that that Schneiderman remained:

> capable of performing simple, short-cycle tasks in a routine work setting without any more than minor infrequent changes. She [was] able to respond appropriately to supervisors and coworkers on goal-oriented task performed at less than a production rate pace. She [was] capable of interacting with supervisors and coworkers in a job that did not require complex communication skills such as negotiating, instructing, persuading, or directing the work of others, nor interaction with the public.

Tr. 26. He thus limited Schneiderman in the RFC to occupations that did not require more than superficial interaction. Tr. 21, 26. Schneiderman argues that in so finding, the ALJ "erroneously expanded the definition of superficial" and says that he defined superficial interaction as not negotiating, instructing, persuading, or directing the work of others. Doc. 6, at 12. Schneiderman argues that she is entitled to remand because this represented "a change in the definition of the term superficial" which was "harmful to [her]." *Id*.

Schneiderman, however, never bothers to explain what the alleged definition of *superficial* is. *See* Doc. 6, at 11–12. Indeed, the term "superficial interaction" is not defined under the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO"). *Betz v. Comm'r of Soc. Sec.*, No. 3:21-cv-2408, 2022 WL 17717496, at *10 (N.D. Ohio Nov. 8, 2022), *report and recommendation adopted*, No. 3:21-cv-2408, 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022); *see Beulah v. Comm'r of Soc. Sec.*, No. 1:20-cv-02271, 2022 WL

1609236, at *29 (N.D. Ohio Mar. 25, 2022) ("superficial is not a defined term"), *report and recommendation adopted sub nom. Beulah v. Kijakazi*, No. 1:20-cv-02271, 2022 WL 1606286 (N.D. Ohio May 20, 2022). She also fails to explain how the ALJ's allegedly "expanded … definition of superficial" could possibly have prejudiced her. As is the case with her argument in Issue 1, Schneiderman's argument here is again undeveloped and perfunctory, and thus, forfeited. *See McPherson*, 125 F.3d at 995–96; *Sharpe*, 2022 WL 2127960, at *4 (citing *Bard*, 970 F.3d at 750). This casual method of argumentation without any effort to develop the issue should not be rewarded.

Even if the Court were to address this argument on the merits, however, Schneiderman would not prevail.

While the ALJ did not find Schneiderman's mild cognitive impairment and occasional depression symptoms disabling, he did account for these impairments in the RFC. Tr. 26. The ALJ found that Schneiderman had the RFC to understand, remember, and carry out simple, short-cycle instructions in a routine work setting with few, minor changes. Tr. 21. He cited Schneiderman's ability to complete simple tasks throughout the relevant time period, by noting that she performed all of her routine activities of daily living, appeared alert and well-oriented at her doctor's appointments, relayed her symptoms to her doctors, socialized with family and friends, and participated in online religious service and self-help meetings. Tr. 26.

In limiting Schneiderman to superficial social interaction, the ALJ quoted the prior administrative findings of state agency consulting psychiatrist Dr. Zeune and Dr. Delcour, who had pertinently found that Schneiderman "retain[ed] the ability to interact on a *superficial* level with coworkers and supervisors but [did] not have the patience to provide services to the general public; and [could] adapt to infrequent changes in a relatively static work environment." Tr. 26 (emphasis added) (citing Tr. 65–67). The ALJ noted that these findings were persuasive in that they reflected the findings he had previously made with regard to the objective medical evidence. Tr. 26. When the ALJ incorporated into the RFC Dr. Zeune's and Dr. Delcour's finding limiting Schneiderman to superficial interaction, he explained that he "rephrased their … finding slightly to provide [a] clear and vocationally relevant definition of the nature of 'superficial' interaction" and to make sure that Schneiderman's mental RFC unequivocally expressed the ALJ's intended maximum allowed by her impairments on a consistent and sustained basis. Tr. 26. The ALJ offered additional findings and explanation which provided helpful context for the otherwise undefined term *superficial*.

Although the ALJ noted that Schneiderman was "[o]verall" pleasant and cooperative, he acknowledged the documented diminishment of her ability to perform complex tasks, stay focused enough to follow through on multistep work duties, respond to novel situations, interact with large groups or unfamiliar people, and make decisions when presented with problems. Tr. 26–

28

27. When the ALJ clarified what he meant by *superficial interaction*, he effectively found that Schneiderman lacked the ability to engage in complex communications as would be required to negotiate, instruct, persuade, or direct the work of others. Tr. 21, 26. These limitations are supported by substantial evidence in the record. Whether, as Schneiderman claims, she should not have been so limited is irrelevant, because she fails to show that the ALJ's findings were *not* supported by substantial evidence. And although she may not agree with the ALJ's interpretation of the term *superficial*, or appreciate the clarity of his explanation, she doesn't explain how his findings or explanation are flawed or unsupported by the record. The ALJ's finding that Schneiderman was limited to *superficial interaction*—and his explanation that he intended *superficial interaction* to mean that Schneiderman lacked the RFC to engage in work-related complex communication—was demonstrably supported by substantial evidence in the record. Schneiderman fails to show otherwise.

*Issue 3: Whether the ALJ committed harmful error in applying SSR 16-3p when he found that Schneiderman's subjective symptoms did not preclude her from engaging in substantial gainful activity on a full-time and sustained basis.*

Ruling 16-3p provides "a two-step process for evaluating an individual's symptoms." Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims, 82 Fed. Reg. 49,462, 49,463 (Oct. 25, 2017). At step one, the ALJ should "determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ should "evaluate the

intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id.* at 49,464.

Schneiderman states a series of conclusions in her legal argument, writing that:

> In this matter the ALJ failed to articulate any supportable rationale for his finding that Schneiderman's statements were not entirely consistent with the medical evidence and other evidence in the record (Tr. 22). This failure resulted in the ALJ failing to include all non-exertional functional limitations imposed by her psychological impairments. In this matter, the basis for the ALJ's determination was contradictory, was in error, and was not supported by the record. The decision in this case failed to contain specific reasons for the finding on credibility, was not supported by the evidence in the case record and was not sufficiently specific to make clear to the individual and to any subsequent reviews the weight the ALJ gave to Schneiderman and/or the remainder of the evidence in this matter.

Doc. 6, at 15.

She provides no analysis to support her claim that the ALJ failed to comply with SSR 16-3p. And she ignores the ALJ's decision. The ALJ cited SSR 16-3p. Tr. 21. He considered Schneiderman's symptoms and the "extent to which they could "be accepted as consistent" with the objective medical evidence and other evidence under 20 C.F.R. 404.1520c and SSR 16-3p. *Id.* He noted that although one might reasonably expect Schneiderman's impairments

to cause the symptoms alleged, her statements about the intensity, persistence and limiting effects of those symptoms weren't entirely consistent with the other evidence. *Id*. Schneiderman also ignores the next five pages of the ALJ's decision, in which he discusses the record evidence in support of all his findings, including those related to her statements about her subjective symptoms. Tr. 21–27.

The ALJ juxtaposed Schneiderman's statements about the intensity, persistence and limiting effects of her symptoms with the objective and other evidence in the record, demonstrating inconsistencies that support his finding. For example, the ALJ acknowledged evidence in support of Schneiderman's decline in mental functioning and the validity of her diagnosis of mild cognitive impairment with short-term memory and delayed recall difficulties. Tr. 25. Over the relevant time period, however, the ALJ cited Schneiderman telling her doctors that her health was "very good" and her quality of life was "excellent," as well as her independently performing her activities of daily life—driving, attending online religious services and AA meetings, travel planning, socializing with family and friends, walking her dog, playing games and coloring on her phone, leading her book club, exercising with her trainer, attending her weekly art class, and reading. Tr. 24–25 (citing Tr. 243–44, 563–67).

Schneiderman's evidence was not as clear cut as she suggests. For instance, Messer testified that Schneiderman would not be able to perform

even a simple job because she wasn't able to remember simple instructions if interrupted. Tr. 53. But Schneiderman earlier testified that with her current skills and abilities, she could perform work as long as her role was less demanding than it was in her previous role. *Compare* Tr. 53–54, *with* Tr. 47. And Schneiderman's treatment notes show that her symptoms were not as severe as she alleged. For example, as the ALJ considered, despite the severity of Schneiderman's condition as alleged by Schneiderman and Messer, Schneiderman's physicians regularly described her as cognitively alert and cooperative, oriented, and normally groomed, with a good mood, a pleasant affect, a calm and pleasant emotional state, and a logical though amnestic thought process. Tr. 25 (citing Tr. 563–67); *see also* Tr. 238, 245, 246, 253, 261–62, 274. And while treatment records support Schneiderman's alleged decline in memory—with MoCa test scores ranging from 16/30 to 25/30, Tr. 22–25 (citing Tr. 237, 251, 274, 304, 334, 556)—and Schneiderman's acute difficulty remembering things after a delay. Tr. 24, (citing Tr. 300, 336). The treatment records also show that her mental status was generally otherwise normal, with a normal attention span, concentration, and fund of knowledge. Tr. 22 (citing Tr. 301, 336).

The ALJ further considered the prior administrative findings of the state agency consultants, which lent additional support for the finding that Schneiderman's symptoms were not as limiting as she alleged. Tr. 26 (citing 61–69, 71–78). Indeed, Dr. Zeune—and Dr. Delcour upon reconsideration—

found that Schneiderman's symptom-related statements were only partially consistent with the objective medical evidence and found that her self-reports of severe memory, attention, and focus limitations were inconsistent with her ability to independently perform all of her activities of daily life. Tr. 66, 75. In her brief, the Commissioner notes that Schneiderman hasn't "attempt[ed] to explain why or how" the evidence she cites would "compel[]  a different result" and she fails to "cite to any authority that would support a different result." Doc. 7, at 11. I agree. As the ALJ's analysis shows, Schneiderman's argument is baseless.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: June 22, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)